# *14-0555*

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

**U.L., as father and natural guardian of E.L.,
an infant under the age of 18 years, and U.L., individually,**
*Plaintiffs-Appellants,*

*-against-*

**NEW YORK STATE ASSEMBLY, NEW YORK STATE SENATE,
SHELDON SILVER, in his official capacity as Speaker of the New York
State Assembly, DEAN G. SKELOS, in his official capacity as President
Pro Tempore of New York State Senate, and as Senate Republican
Conference Leader, JEFFREY D. KLEIN, in his official capacity as
President Pro Tempore of New York State Senate, and as Senate
Independent Conference Leader, and THE STATE OF NEW YORK,**
*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE PLAINTIFFS-APPELLANTS

> **ELLIOT B. PASIK, ESQ.**
> *Of Counsel*
>
> **LAW OFFICES OF GERALD P. GROSS**
> *Attorneys for Plaintiffs-Appellants
> U.L., as father and natural guardian
> of E.L., et al
> 366 Pearsall Avenue, Suite 5
> Cedarhurst, New York 11516
> (516) 371-2800*

Echo Appellate Press, Inc. • 30 West Park Avenue • Long Beach, New York 11561 • (516) 432-3601

Printed on Recycled Paper                    20651

U.S COURT OF APPEALS
FOR THE SECOND CIRCUIT
-------------------------------------------------------------------------------------x
U.L., as father and natural guardian of
E.L., an infant under the age of 18 years,
and U.L., individually,

Plaintiffs-Appellants,

-against-

New York State Assembly, New York State Senate, Sheldon Silver,
in his official capacity as Speaker of the New York State Assembly,
Dean G. Skelos, in his official capacity as President Pro Tempore of
New York State Senate, and as Senate Republican Conference Leader,
Jeffrey D. Klein, in his official capacity as President Pro Tempore of
New York State Senate, and as Senate Independent Conference Leader,
and The State of New York,

Defendants-Appellees.

-------------------------------------------------------------------------------------x

<h2>TABLE OF CONTENTS</h2>

<strong>PAGE</strong>

Table of Authorities .................................................................................................i

Introduction ..........................................................................................................1

Statement of Jurisdiction........................................................................................3

Statement of the Issues and Standard of Review ....................................................5

     a. Statement of the Issues ...............................................................................5

     b. Standard of Review.....................................................................................7

Statement of the Case...............................................................................................8

     a. Introduction, pursuant to Local Rule 28.1 .................................................8

     b. Facts Relevant to the Issues Submitted for Review .................................10

i

Summary of Argument............................................................................21

Argument    ...........................................................................................22

Point I
Plaintiff's Motion for Leave to Serve a Second Amended
Complaint Adding Legislative Leaders Silver, Skelos, and
Klein Individually, Pursuant to FRCP Rule 15, Should be Granted.............22

Point II
The Claims for Relief are not Barred by Either
Legislative or Sovereign Immunity.................................................23

Point III
Plaintiffs Possess Article III Standing...........................................28

Point IV
Plaintiffs Have Been Denied Equal Protection of the Law...........................29

Point V
Defendants Violate the Due Process/Liberty Clause
of the 14th Amendment...................................................................37

Point VI
Defendants Infringe Upon Plaintiffs' Free Exercise
of Religion Rights.........................................................................41

Point VII
Defendants Have Infringed Upon Plaintiffs'
Establishment Clause Rights..........................................................43

Conclusion    .........................................................................................46

Certificate of Compliance.........................................................................47

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)..........8

*Bethel School Dist. v. Fraser,* 478 U.S. 675, 684 (1986)...........30

*Binghamton City Sch. Dist. v. Peacock,* 33 A.D.3d 1074,
1076 (3rd Dept. 2006), *app. dism* 8 N.Y.3d 840 (2007).....…......31

*Brown v. Bd. of Ed.,* 347 U.S. 483, 496 (1954).....................29

*Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991)............  8

*Campaign for Fiscal Eq. v. State of NY,* 86 NY2d 307 (1995)...25

*Cent. Rabbinical Cong. v. NYC Dept. of Health,*
2013 U.S. Dist. 4293 (S.D.N.Y. 2013)..............................26

*Clubside, Inc. v. Valentin,* 468 F.3d 144, 152 (2d Cir. 2006)......8

*Christian Heritage Acad. v. Okla. Secondary Sch.*
*Activities Ass'n,* 483 F.3d 1025 (10th Cir. 2007)…….....…..........35

*Church of Lukumi v. City of Hialeah,* 508 U.S. 520, (1993).......29

*City of Cleburne v. Cleburne Living Center,*
473 U.S. 432, 439 (1985).........................................35

*Commack Self Service Kosher Meats v. Weiss,*
294 F.3d 415 (2d Cir. 2002)......................................26

*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)......................7

*DeShaney v. Winnebago Co. Dept. of Soc. Serv.,*
489 U.S. 189 (1989)..............................................35

*Estate of Rosenbaum v. City of NY,* 975 F. Supp. 206
(E.D.N.Y. 1997)..................................................36

*Ex Parte Young,* 209 U.S. 123 (1908)...........................25-26

*Finlay v. Finlay,* 240 N.Y. 429, 434 (1925).........................31

*Foman v. Davis,* 371 U.S. 178, 182 (1962).........................22

*Gollomp v. Spitzer,* 568 F.3d *355,* 366 (2d Cir. 2009).............27

*Goosby v. Town Bd.,* 180 F.3d 476 (2d Cir. 1999).................30

*Griffin v. County School Board,* 377 U.S. 218 (1964).............24

*Harsco Corp. v. Segui,* 91 F.3d 337, 341 (2d Cir. 1996)............7,8

*Hoose v. Drumm,* 281 N.Y. 54, 57-58 (1939).......................31

*Jenkins v. Missouri,* 493 U.S. 33 (1990)............................24

*Lawrence v. Texas,* 539 U.S. 558 (2003)............................38

*Leatherman v. Tarrant Co. Narcotics Intell. & Coordination Unit,* 507 U.S. 163, 164 (1993)..........................7

*Linda R.S. v. Richard D.,* 410 U.S. 614 (1973).....................28

*Loving v. Va.,* 388 U.S. 1 (1967)...................................29

*Lynch v. State, 2011 US Dist Lexis 155012 at 188, and n. 274 (*N.D. Ala. 2011).....................................26

*Madden v. Kentucky,* 309 U.S. 83, 92 (1940).......................26

*Marbury v. Madison,* 5 U.S. 137 (1803)............................23

*Maron v. Silver,* 14 N.Y.3d 230, 263 (2010).................24-25

*Matshushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)...........................................8

*Matter of Shurgin v Ambach*, 56 NY2d 700, 703 (1982)……... 31

*McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006)…………..8

*Milliken v. Bradley*, 433 U.S. 267 (1977)…………………….24

*Mody v. City of Hoboken*, 758 F. Supp. 1027 (D. N.J. 1991)…...35

*Mrs. W. v. Tirozzi*, 832 F.2d 748 (2d Cir. 1987)………………….7

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925)……………..37,41

*Pratt v. Robinson*, 39 N.Y.2d 554, 560 (1976)…………………..31

*Prince v. Mass.*, 321 U.S. 158, 165-168 (1944)………………….30

*Public Citizen, Inc. v. Nat'l. Highway Traffic Safety Admin.*,
489 F.3d 1279 (D.C. Cir. 2007)………………………………..28

*Ricciuti v. NYC Transit Authority*, 941 F.2d 119, 123
(2d Cir. 1991)……………………………………………………7

*Robinson v. Commonwealth*, 584 N.E.2d 636 (1992)……………35

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)……………………7

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 28 (1976)…….28

*Skinner v. Oklahoma*, 316 U.S. 535 (1942)……………………..29

*Smith v. Gilpin Co.*, 949 F. Supp. 1498 (D. Col. 1996)……………35

*Spallone v. United States*, 493 U.S. 265, 278-280 (1990)…………23

*State Emps. Barg. Agent v. Rowland*, 494 F.3d 71
(2d Cir. 2007)……………………………………………………25

*Supreme Court of Virginia v. Consumers Union of U.S., Inc.*,
444 U.S. 719 (1980)…………………………………………....25

*Texas Monthly, Inc. v. Bullock*, 489 U.S.1, 8 (1989)…………..44-45

*Thom v. NY Stock Exch.*, 306 F. Supp. 1002, 1007-1008
(S.D.N.Y. 1969)..........................................................34

*U.L. v. NYS Assembly*, 2014 U.S. Dist. Lexis 11215,
2014 WL 322108 (S.D.N.Y. 2014).................................10

*United States v. Kelly*, 55 F.2d 67, 70 (2d Cir. 1932)...............34

*United States v. Carolene Prods. Co.*, 304 U.S. 144,
152 at n.4 (1938).....................................................29-30

*Veronica Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995).........30

*Vill. of Arlington Hts. v. Metro Housing Dev. Corp.,*
429 U.S. 252, 265-266 (1977)........................................30

*Zobrest v. Catalina Foothills Sch. Dist.,* 409 U.S. 1, 8 (1953)........36

## <u>US Constitution and Federal Statutes</u>

Fed. R. Civ. Proc. 12....................................................4,7,9,46

Fed. R. Civ. Proc. 15....................................................4,22,46

Fed. R. Civ. Proc. 56....................................................4,46

28 U.S.C. 1291..........................................................4

28 U.S.C. 1331..........................................................3

42 U.S.C. 1983..........................................................3,5,9

United States Constitution Article III...............................6,9

United States Constitution, Amendments 1 and 14.....................*passim*

## NYS Constitution, Statutes, and Regulations

Educ. Law Article 12…………………………………………………..31

Educ. Law Article 23-B……………………………………………….31

Educ. Law Article 55 (sects. 2801, 2801-a, 2802, and 2814)…….12,15,40

Educ. Law Article 296 [4]…………………………………………...31

Educ. Law sect. 305(30)…………………………………….11,12,14,33

Educ. Law sect. 409-a……………………………………………...32

Educ. Law sect. 549(1)……………………………………………..31

Educ. Law sect. 803-a……………………………………………...14

Educ. Law sect. 804……………………………………………......32

Educ. Law sect. 807………………………………………………..32

Educ. Law 807-a…………………………………………………...32

Educ. Law 808…………………………………………………...32

Educ. Law sect. 814………………………………………………..14

Educ. Law sect. 912……………………………………………….32

Educ. Law sect. 917……………………………………………….15

Educ. Law sects. 1125-1133……………………………….....14,39

Educ. Law sect. 1126………………………………………………..12

Educ. Law sect. 1131……………………………………………....14

Educ. Law sect. 1133………………………………………….12,15

Educ. Law sect. 2590-h (20)…………………………………..12,14,33

Educ. Law 3001-d……………………………………………...11

Educ. Law sect. 3004......................................................................15,39

Educ. Law 3209-a.........................................................................15,40

Educ. Law 3204(1)..............................................................................40

Family Ct Act, Article 10.....................................................................31

Labor Law 201-a..................................................................................12

Legislative Law sect. 1-a.....................................................................27

Public Health Law sect. 2164..............................................................32

Public Health Law sect. 2899..............................................................33

Public Health Law sect. 2899-a...........................................................33

24 Rules of the City of New York 47.15...............................................34

24 Rules of the City of New York 43.13...............................................34

Social Services Law sect. 384-b..........................................................31

Social Services Law sect. 390-b..........................................................33

Soc. Serv. Law sect. 413.....................................................................20

Soc. Serv. Law sect. 420.....................................................................20

Vehicle & Traffic Law 509-d...............................................................33

NYS Constitution Article XIII, sect. 1..................................................27

## Other State Statutes

Alabama sect. 16-22A-6.......................................................................33

California Educ. Code sections 33190(a), (g)........................................33

Florida sect. 1002.421 (2)(i)................................................................33

Illinois ILCS 512-3.250..................................................................33

Louisiana R.S. 15:587.1................................................................33

Maryland: Family Law Code Ann. sect. 5-561.............................33

Massachusetts 71 M.G.L. 38R......................................................33

Michigan M.C.L.S. sect.380.1230................................................33

Minnesota Stat. sect. 123B.03......................................................33

Ohio R.C. 3319.391......................................................................33

Pennsylvania 24 P.S. sect. 1-111.................................................33

Rhode Island Gen. Laws sect. 16-2-18.1....................................33

## Other Authorities

Abrams, "Cross Purposes: Pierce v. Society of Sisters and the Struggle
Over Compulsory Public Education" (Univ. of Mich. 2009)................38

Bharara, "Deafening Silence From Albany Pols", NY Post,
April 5, 2013..................................................................................19

Brennan Center at the NYU Law School issued a 2008 report,
entitled, "Still Broken: New York Legislative Reform".......................15

Buschmann, "Mandatory Fingerprinting of Public School Teachers:
Facilitating Background Checks or Infringing on Individuals'
Constitutional Rights?", 11 William & Mary Bill of Rights Journal
1273 (2003)....................................................................................35

Center for Public Integrity report...................................................16

Citizen Union of the City of New York report, "Summary of
Turnover in the NYS Legislature Due to Ethical or Criminal Issues,
1999 to 2013" dated May 6, 2013..................................................16

Cole, "Suspect Identities: History of Fingerprinting and Criminal
Identification" (Harvard Univ. Pr. 2002).......................................22

Cuomo, "How We Will Clean Up Albany: Disclosure laws
and an anti-corruption panel are major wins for the public",
NY Daily News, July 5, 2013...................................................19

D'Antonio, "Mortal Sins: Sex, Crime and the Era of
Catholic Scandal (Thomas Dunne Books 2013)...........................15

Davis, "America's True History of Religious Tolerance:
The idea that the United States has always been a bastion of religious
freedom is reassuring – and utterly at odds with the historical record",
Smithsonian Magazine October 2010.......................................30

Davis, "The Sins of Brother Curtis: A Story of Betrayal, Conviction
and the Mormon Church" (Scribner 2011)..................................11

"Days of Honest Graft", City & State, January 29, 2014..................18

Dratch, "Let Them Talk: The Mitzvah to Speak Lashon Hara
(Malicious Gossip)", January 19, 2006.....................................21

Dratch, "The 411 on 911: Reporting Jewish Abusers to the Civil
Authorities", February 22, 2006............................................20

Dwyer, "The Children We Abandon: Religious Exemptions to Child
Welfare and Education Laws as Denials of Equal Protection to
Children of Religious Objectors", 74 N. Car. L. Rev. 1322 (1996).........36

Dwyer, "Religious Schools v. Children's Rights"
(Cornell Univ. Pr. 1998)...................................................36

Edelman, "Brooklyn DA Releases Names of 46 Convicted Child
Sex-Abusers Who Terrorized the Orthodox Jewish Community
From Within", NY Post, July 21, 2013...............................10,11

Eidensohn, "Child and Domestic Abuse:
Torah, Psychological and Legal Perspectives (Emuna Pr. 2010)...........11

Epps, "Democracy Reborn: The Fourteenth Amendment and the
Fight for Equal Rights in Post-Civil War America (Holt 2006).............29

Frawley-O'Dea, "Perversion of Power:
Sexual Abuse in the Catholic Church" (Vanderbilt Univ. Pr. 2007)........11

Gov. Cuomo's Press Release dated July 2, 2013...........................19

Gov. Cuomo's Executive Order dated July 2, 2013.........................19

Heimlich, "Breaking Their Will: Shedding Light on Religious Child
Maltreatment" (Promestheus Books 2011).....................................11

Hamilton, "God vs. The Gavel: Religion and the Rule of Law"
(Cambridge Univ. Pr. 2005)...................................................45

Investigative Staff of Boston Globe, "Betrayal:
The Crisis in the Catholic Church (Boston Globe 2002)....................11

Kaplan, "With Panel Gone, a Move to Monitor New York
Lawmakers' Income Is Thwarted", NY Times, April 16, 2014..............19

Kaplan and McKinley, "Corruption Panel's Report Offers Look at
the Payback Culture in Albany, NY Times, December 2, 2013.............19

Keenan, "Child Sexual Abuse and the Catholic Church: Gender,
Power and Organizational Culture" (Oxford Univ. Pr. 2012)...............11

Kolker, "On the Rabbi's Knee: Do the Orthodox Jews Have
a Catholic Priest Problem", New York Magazine, May 22, 2006...........10

Lachman and Polner, "Three Men in a Room" (New Press 2006)..........17

Lifflander, "The Tragedy That Changed New York,"
New York Archives (Summer 2011)...........................................13

Lytton, "Holding Bishops Accountable: How Lawsuits Helped the
Catholic Church Confront Clergy Sexual Abuse (Harvard Pr. 2008).......11

Mandel and Pelcovitz, "Breaking the Silence:
Sexual Abuse in the Jewish Community" (Ktav Pub. 2011)................11

Matthews, "Sexual Abuse of Power in the Black Church"
(Westbow Pr. 2012)..........................................................11

McKinley and Kaplan, "Capitol Corruption Panel's Demise Angers
Watchdogs", NY Times, March 31, 2014....................................19

Moreland Commission Report dated December 2, 2013.....................19

ix

Neustein, "Tempest in the Temple: Jewish Communities and
Child Sex Scandals (Brandeis Univ. Pr. 2009)...............................11

Note, "The Legislative Injunction: A Remedy for Unconstitutional
Legislative Inaction", 99 Yale Law Journal 231 (Oct. 1989)..................24

Odato, "Kellner shut down by Silver for alleged harassment",
Albany Times Union, June 11, 2014.............................................17

Powell, "For Prosecutor in Sexual Abuse Case, Muted Praise
From One Corner", NY Times, December 18, 2012...........................20

Resnikoff, "Jewish Law and the Tragedy of Sexual Abuse of
Children – The Dilemma Within the Orthodox Jewish Community,"
13 Rutgers Journal of Law & Religion (2012).................................11

Salomon, "Abuse in the Jewish Community: Religious and
Communal Factors that Undermine the Apprehension of Offenders
and Treatment of Victims" (Urim Pub. 2011)................................11

"School Law" (NYS Bar Assn., 34th ed. 2012)..............................40

Swan, "The Last Strawberry" (Hag's Head Press 2010).....................11

"Transportation Security Adm. Completes Background Checks
on 1 Million Truckers" (2008)................................................34

United State Department of Education, "Educator Sexual Misconduct:
A Synthesis of Existing Literature" (2004)..................................... 32

Zeveloff, "Leiby Kletzy Killing Calls for Oversight of Yeshivas:
Advocates Want Fingerprints and Background Checks of
Employees", Jewish Daily Forward, August 5, 2011..........................20

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

-----------------------------------------------------------------------------------x

U.L., as father and natural guardian of E.L., an infant under the
age of 18 years, and U.L., individually,

Plaintiffs-Appellants,

-against-

14-0555

NEW YORK STATE ASSEMBLY, NEW YORK STATE SENATE,
SHELDON SILVER, in his official capacity as Speaker of the
New York State Assembly, DEAN G. SKELOS, in his official
capacity as President Pro Tempore of New York State Senate,
and as Senate Republican Conference Leader, JEFFREY D. KLEIN,
in his official capacity as President Pro Tempore of New York State
Senate, and as Senate Independent Conference Leader, and
THE STATE OF NEW YORK,

Defendants-Appellees.

-----------------------------------------------------------------------------------x

## **INTRODUCTION**

About 400,000 children attend k-12 nonpublic schools in New York State,

13% of the total school-age population.  Most of these children, 330,000, attend

religious schools, primarily Christian and Jewish.

New York has many laws protecting public school children.  Public schools

must fingerprint and background check their prospective employees.  Public school

employees must be taught to prevent and detect child abuse.  All public schools are

required to establish abuse prevention and school safety plans.  If a public school

1

employee abuses a child, it must be reported to law enforcement. The Amended Complaint compiles ten such public school child protection laws.

These ten laws, despite being religiously neutral and therefore presenting no church-state separation concerns if applied universally, do not apply to the non-public schools. It is no wonder, therefore, that religious and private school children in New York have been subjected to sexual and physical abuse by deviant clergy, teachers, and others. The religious and private schools are, in effect, a legal no-man's land, where child abuse has festered and even thrived for decades.

Attempts by advocates, for more than seven years, to persuade the State Legislature to remedy this situation have failed, for several reasons. The religious school establishment is ultra-conservative, and resists any attempts at regulation. The State Legislature has long been plagued by dysfunction and corruption. Advocates for the nonpublic school children are few in numbers, poorly funded, lack power and connections, and are unable to make the ubiquitous campaign donations to New York legislators that will "merit" return phone calls. Almost all attention in New York is focused on public school education. The large, well-funded public school teacher unions are also very influential.

Plaintiff-appellant U.L. is the father of a child who attends a private Jewish school. He pleads that the statutory scheme of exempting New York's non-public schools from child protection laws patently infringes on his and his

daughter's constitutional rights – rights to equal protection, substantive due process/liberty, free exercise of religion, and that it also violates the Establishment Clause.  Defendants are the New York State Assembly and Senate, their leaders Sheldon Silver, Dean G. Skelos, and Jeffrey D. Klein, and the State of New York. Plaintiffs demand declaratory and injunctive relief that would result in all non-public school children receiving the identical legal protection from abuse that public school children receive.

The District Court, on January 29, 2014, dismissed the action on grounds that the doctrines of legislative and sovereign immunity bar any lawsuit against the Legislature and its leaders. Plaintiff appeals.

## STATEMENT OF JURISDICTION

Plaintiffs pleaded that the District Court possessed federal question jurisdiction, pursuant to 42 U.S.C. sect. 1983, the Civil Rights Act of 1871; the First and Fourteenth Amendments of the U.S. Constitution; and 28 U.S.C. sect. 1331, see, Amended Complaint para. 4, filed March 21, 2013, at Appendix page 4.[1]

The relevant facts establishing District Court jurisdiction are that plaintiff E.L. is a child attending a non-public Jewish school in New York. Defendants have infringed upon her constitutional rights by failing to grant her the identical legal

---

[1] References to pages in the Appendix shall heretofore be, A, followed by the page number.

3

protections from abuse received by public school children. Declaratory and injunctive relief is sought.

The Court of Appeals possesses jurisdiction pursuant to 28 U.S.C. sect. 1291. The facts giving rise to Court of Appeals jurisdiction are that defendants, in the District Court, in April 2013, filed an FRCP Rule 12(b)(6) pre-Answer motion to dismiss, on three grounds: (a) that defendants are immune; (b) plaintiffs lack standing; (c) on the merits, i.e., that plaintiffs' constitutional rights were not infringed (A42). Plaintiffs, in June 2013, opposed the motion to dismiss, and cross-moved for leave to file a Second Amended Complaint, pursuant to FRCP Rule 15, which, addressing an alleged gap in pleading, would name the three legislative leaders, Silver, Skelos, and Klein, in both their official and individual capacities, and would also plead that plaintiff's yeshiva does not fingerprint and background check its employees; and plaintiffs also cross-moved for summary judgment pursuant to FRCP Rules 12(d) and 56 (A45). The District Court, by opinion and order of Judge Thomas P. Griesa, dated January 29, 2014, granted defendants' motion to dismiss on immunity grounds, and denied plaintiffs' motions (A203). A final judgment of dismissal was entered on January 30, 2014 (A212). Plaintiffs timely filed a Notice of Appeal on February 21, 2014 (A213).

4

## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

### a.    Statement of the Issues

1. Pursuant to FRCP Rule 15, should plaintiffs' cross-motion for leave to serve a Second Amended Complaint be granted, in the circumstance where the primary sought-for amendment was to name defendants Silver, Skelos, and Klein in their individual capacities?  In the original Complaint filed January 18, 2013, and first Amended Complaint, filed March 21, 2013, they were named in their official legislative capacities only.  The amendment, in response to the motion to dismiss, was sought so that the defenses of legislative and/or sovereign immunity could be fully addressed, and should the court find that immunity does not attach to these defendants, then the merits of plaintiffs' claims for relief, under 42 U.S.C. 1983, and the First and Fourteenth Amendments, could be reached.  The proposed Second Amended Complaint, at para. 3, also pled that the plaintiff child attends a school that does not fingerprint and background check its employees.  This allegation was added to address defendants' argument, in their motion to dismiss, that plaintiffs lacked Article III standing under the Constitution.

2. Do the doctrines of legislative and/or sovereign immunity bar the plaintiffs from seeking declaratory and injunctive relief against defendants, where plaintiffs persuasively assert that their federal constitutional rights have been violated as a result of New York having a statutory scheme that protects public

5

school children from sexual and physical abuse, but not nonpublic school children?

3.  Do the plaintiffs have standing, under Article III of the U.S. Constitution, to bring their claims for relief?

4.  Public and nonpublic school children are similarly situated groups. However, public school children are legally protected from sexual and physical abuse, while nonpublic school children are not.  Accordingly, have plaintiffs' equal protection rights, under the 14th Amendment of the Constitution, been denied, which entitles them to appropriate declaratory and injunctive relief?

5.  Under the substantive Due Process/Liberty clause of the 14th Amendment, parents are entitled to enroll their children in religious and other nonpublic schools.  Defendants, by exempting all nonpublic schools from child protection laws, have actually made the nonpublic schools hazardous.  Is this a denial of plaintiffs' substantive due process/liberty rights, which entitles them to appropriate declaratory and injunctive relief?

6.  The 1st Amendment protects the free exercise of religion.  By exempting plaintiffs' religious school from child protection laws, thus rendering the child vulnerable to sexual and physical abuse, have defendants burdened plaintiffs' practice of religion, and infringed upon their free exercise rights, and if so, are plaintiffs entitled to appropriate declaratory and injunctive relief?

6

7.  The Establishment Clause of the 1ˢᵗ Amendment is supposed to prevent New York from favoring one religion over another, and from favoring or disfavoring religion relative to non-religion.  By capitulating to ultra-orthodox Jewish groups and other religions who oppose any type of government regulation of their schools, even basic child protection laws, have defendants violated the Establishment Clause, and if so, is plaintiff entitled to appropriate declaratory and injunctive relief?

**b.    Standard of Review**

On defendant's pre-Answer, Rule 12(b)(6) motion to dismiss, the allegations of the complaint are deemed true, and read in the light most favorable to plaintiffs. All inferences are drawn in plaintiffs' favor. *Mrs. W. v. Tirozzi,* 832 F.2d 748 (2d Cir. 1987).  A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ricciuti v. NYC Transit Authority,* 941 F.2d 119, 123 (2d Cir. 1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).  "A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits," *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), quoted in, *Harsco Corp. v. Segui*, 91 F.3d 337, 341 (2d Cir. 1996). Further, the appellate court "must accept as true all the factual allegations in the complaint." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507

7

U.S. 163, 164 (1993), quoted in *Harsco Corp., supra*. Appellate review of a Rule 12(b)(6) dismissal is *de novo, Harsco Corp., id.*

Plaintiffs cross-moved for summary judgment, under Rules 12(d) and 56, supporting their motion with the declaration of plaintiff Uriel Levi, and documentary proof annexed as exhibits. Defendants, opposing the motion, submitted no evidence, and presented legal argument only.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006). "The nonmoving party cannot defeat summary judgment by 'simply show(ing) that there is some metaphysical doubt as to the material facts,'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), or by a factual argument based on "conjecture or surmise", *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991). A denial of summary judgment is reviewed *de novo, Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006).

## STATEMENT OF THE CASE

### a.    Introduction, pursuant to Local Rule 28.1

Plaintiff-appellants are a child who attends a New York yeshiva, and her father. Her school, and its students, are unprotected by ten child protection laws

8

that govern New York's public schools.  In the face of the clergy sex abuse crisis sweeping New York and the world, advocates have, for years, attempted to persuade the New York Legislature to extend all public school child protection laws to the nonpublic schools – e.g., prospective employee fingerprinting and background checks; mandated reporting of school-based abuse incidents to law enforcement; abuse prevention and school safety plans, etc.  The Legislature, plagued by petty, hierarchal politics, apathy, and corruption, has done nothing.  In January 2013, this lawsuit was filed seeking declaratory and injunctive relief against the Legislature, its individual leaders, Silver, Skelos, and Klein, and the State of New York.  Through the procedural corridor of 42 U.S.C. sect. 1983, four claims for relief are pleaded in the first Amended Complaint, dated March 8, 2013.  In order, the claims plead that plaintiffs' constitutional rights under the 14th Amendment Equal Protection clause, the 14th Amendment Due Process/Liberty clause, the 1st Amendment Free Exercise Clause, and the 1st Amendment Establishment Clause, have been violated.

On April 2, 2013, defendants filed a Rule 12(b)(6), pre-Answer motion to dismiss, on grounds that (a) defendants were all immune from suit; (b) plaintiffs lack standing under Article III of the U.S. Constitution; (c) on the merits, plaintiffs did not plead sufficient claims for relief.  A42.

On June 26, 2013, plaintiffs opposed the motion to dismiss, and

9

cross-moved for leave to file a Second Amended Complaint, pursuant to Rule 15, naming Silver, Skelos and Klein in both their official and individual capacities, and pleading that plaintiff's yeshiva does not fingerprint and background check its employees; and plaintiffs cross-moved for summary judgment under Rule 12(d) and 56. Plaintiffs sought a declaration that their constitutional rights were violated, and that defendants should be enjoined from exempting the non-public schools from child protection laws. A45.

By opinion and order dated January 29, 2014, Judge Thomas P. Griesa, granted the motion to dismiss on sovereign and legislative immunity grounds. A203. See, *U.L. v. New York State Assembly*, 2014 U.S. Dist. Lexis 11215, 2014 WL 322108 (S.D.N.Y. 2014). The Clerk entered a judgment of dismissal on January 30, 2014. A213.

**b.      Facts Relevant to the Issues Submitted for Review**

Public disclosure of the global clergy child abuse crisis began in Boston in 2002 (Amended Complaint para. 26, at A19). In New York, there were grand jury investigations of Catholic churches and schools, in Westchester and Suffolk Counties, in 2002 and 2003 (Amended Complaint, para. 27, at A19; see, BishopAccountability.org, which contains links to the grand jury reports, and digests thousands of criminal and civil cases). There have been arrests and convictions throughout New York (*id.*).

10

In orthodox Jewish institutions, the starting point for public disclosure about child sex abuse began in 2005 (Amended Complaint para. 28, at A19; Kolker, "On the Rabbi's Knee: Do the Orthodox Jews Have a Catholic Priest Problem", New York Magazine, May 22, 2006), and continues to present day, see, Edelman, "Brooklyn DA Releases Names of 46 Convicted Child Sex-Abusers Who Terrorized the Orthodox Jewish Community From Within", NY Post, July 21, 2013 (A162).

There is now a significant body of well-researched literature chronicling and analysing the crisis of child abuse occurring in religious institutions.[2]

---

[2] **In Catholic institutions**, see, e.g., D'Antonio, "Mortal Sins: Sex, Crime and the Era of Catholic Scandal (Thomas Dunne Books 2013); Keenan, "Child Sexual Abuse and the Catholic Church: Gender, Power and Organizational Culture" (Oxford Univ. Pr. 2012); Lytton, "Holding Bishops Accountable: How Lawsuits Helped the Catholic Church Confront Clergy Sexual Abuse (Harvard Univ. Pr. 2008); Frawley-O'Dea, "Perversion of Power: Sexual Abuse in the Catholic Church" (Vanderbilt Univ. Pr. 2007); Investigate Staff of Boston Globe, "Betrayal: The Crisis in the Catholic Church (Boston Globe 2002). **Jewish institutions**: Resnikoff, "Jewish Law and the Tragedy of Sexual Abuse of Children – The Dilemma Within the Orthodox Jewish Community," 13 Rutgers Journal of Law & Religion (2012); Mandel and Pelcovitz, "Breaking the Silence: Sexual Abuse in the Jewish Community" (Ktav Pub. 2011); Salomon, "Abuse in the Jewish Community: Religious and Communal Factors that Undermine the Apprehension of Offenders and Treatment of Victims" (Urim Pub. 2011); Eidensohn, "Child and Domestic Abuse: Torah, Psychological and Legal Perspectives (Emuna Pr. 2010); Neustein, "Tempest in the Temple: Jewish Communities and Child Sex Scandals (Brandeis Univ. Pr. 2009). **Other religious institutions**: Matthews, "Sexual Abuse of Power in the Black Church" (Westbow Pr. 2012); Davis, "The Sins of Brother Curtis: A Story of Betrayal, Conviction and the Mormon Church" (Scribner 2011); Swan, "The Last Strawberry" (Hag's Head Press 2010) (about Christian Science); Heimlich, "Breaking Their Will: Shedding Light on Religious Child Maltreatment" (Promestheus Books 2011) (overall review).

11

The New York Legislature - 63 Senators, and 150 Assembly members - has mostly failed to address this ongoing crisis.    Only in 2006, responding to advocates, did the Legislature correct a significant deficiency in New York statutory law, by at least permitting non-public schools to fingerprint and background check their employees (Amended Complaint para. 43, at A23; see, N.Y. Educ. Law sects. 305(30), and 3001-d).    It had been illegal to do so since 1937, pursuant to Labor Law sect. 201-a.    In the public schools, prospective employee fingerprinting was mandatory in New York City since 1974 (N.Y. Educ. Law sect. 2590-h(20); and mandatory throughout New York State since 2001, as part of the Project SAVE legislative package (N.Y. Educ. Law sect. 305(30)).

Project SAVE - Safe Schools Against Violence in Education - was a package of public school child protection laws enacted by the Legislature in 2001. The SAVE laws primarily required, for public schools only, mandatory prospective employee fingerprinting and background checks throughout the State (Educ. Law sect. 305(30)); mandated reporting of abuse committed in a public school to law enforcement (Educ. Law sect. 1126); illegality of silent resignations of public school employees (Educ. Law sect. 1133); mandatory public school safety plans (Educ. Law Article 55). (Amended Complaint, para. 16, A4).  SAVE exempted the non-public schools.

Despite the ongoing clergy abuse  crisis,  the  non-public  school  optional

12

fingerprint law has been under-utilized. Of 1,900 non-public schools, only 45 are fingerprinting (Amended Complaint para. 46, at A24; see, Freedom of Information Law response of NYS Department of Education, dated September 13, 2012, at A120). Registered sex offenders, and other persons with serious criminal histories, can thus, not vetted, secure employment in the non-public schools.

In 2007, the State Senate, 60-1, did pass a bill that would have made prospective employee fingerprinting mandatory for the non-public schools, but the Assembly refused to vote (Amended Complaint para. 44, at A24).

Since 2007, there has been no legislative activity leading to passage of any non-public school child protection bill. There have been no public hearings, committee reports, nor floor debates. In some, but not all years, mandatory fingerprint bills were introduced, but died. There have been no votes, except for 2007, in the Senate. Mandatory fingerprinting was the only non-public school child protection bill ever introduced. (Amended Complaint paras. 44, 61, 63, 64, at A24, 30-32).[3]

---

[3] Contrast should be made to the Triangle Shirtwaist Factory fire, in lower Manhattan, on March 25, 1911, when 146 garment workers died. The Legislature established a Factory Investigating Commission. From 1911 to 1913, sixty of the sixty-four laws proposed by the Commission were enacted. See, generally, Lifflander, "The Tragedy That Changed New York," New York Archives (Summer 2011). These laws served as a model for other states, and ultimately, for the New Deal labor legislation in the 1930s during the Roosevelt Administration.

As a result of the Legislature exempting the non-public schools from child protection laws, registered sex offenders, and other persons with serious criminal histories may, undetected, and quite legally, seek and secure employment in New York's religious and private schools.    They need not be fingerprinted and background checked.[4]    Nonpublic school teachers and administrators are not obligated, unlike their public school counterparts, to report to the government abuse inflicted by their teachers upon the students.    Abusive nonpublic school employees may silently resign from one yeshiva or Catholic school, and secure employment in another yeshiva or Catholic school.    Amended Complaint para. 63, at A30-32, lists ten child protection laws, including the 2001 SAVE laws, that protect public school children, but not non-public school children.    They are:

1.    Educ. Law sect. 803-a: All k-8 public school pupils shall receive instruction to prevent the abduction of children;

2.    Educ. Law sect. 814: Any public school district may provide k-12 pupils instruction to promote the proper and safe use of the internet. The commissioner of education shall develop age appropriate resources and technical assistances for schools, parents and guardians.

3.    Educ. Law sects. 2590-h and 305(30), respectively, require the fingerprinting and criminal history searches of all New York City and

---

[4] Amended Complaint para. 52, A26-28, cites media reports, and one federal government report, where registered sex offenders, and other persons with serious criminal histories, were found to be working in non-public schools, and committed crimes, including rape.  There are 35,000 registered sex offenders in New York, and nationally, 736,000 (Pasik declaration, para. 12, A159, A187).  The U.S. Justice Department informs there are 7 million Americans under correctional supervision, as of 2011 (Pasik declaration, para.13, A159.)

New York State prospective school employees.  It is optional for nonpublic schools, pursuant to Educ. Law sects. 305(30) and 3001-d. Educ. Law 305(30) was a 2001 SAVE law.

4.     Educ. Law sects. 1125-1133 is the mandated reporting law for child abuse occurring in an "educational setting", defined as public schools only.  Public school employees must report public school-based abuse to law enforcement.  This was a 2001 SAVE law.

5.     Educ. Law sect. 1131 provides that whenever a public school employee is convicted of a crime involving child abuse in an educational setting, defined as public schools only, the district attorney is required to inform public school authorities, and the Commissioner of Education is then required to determine whether the employee possesses good moral character in accordance with the Commissioner's regulations.  This was a 2001 SAVE law.

6.     Educ. Law sect. 1133 provides that unreported resignations of public school employees, against whom an allegation of public school-based child abuse is made, are against public policy.  Public school officials are prohibited from making any agreement not to report such resignations to law enforcement authorities.  The violation of this section is a felony.  This was a 2001 SAVE law.

7.     Educ. Law sect. 3004 provides that all public school administrators and teachers are required to complete coursework in identifying and reporting child abuse, and in preventing school violence.

8.     Educ. Law Article 55 (sects. 2801, 2801-a, 2802, and 2814) requires public schools only to establish and implement school safety plans. This was a 2001 SAVE law.

9.     Educ. Law sect. 3209-a requires all public school districts to establish and implement written policies necessary to safeguard the life and health of children and to prevent abuse.

10.    Educ. Law sect. 917 requires all public schools, BOCES county vocational education and extension boards, and charter schools to maintain on site, in each school facility, automated external defibrillator equipment.

15

Why has the Legislature exempted the non-public schools from all of these child protection laws?    And, why have so many children been sexually and physically abused in the religious and private schools, and the Legislature stands idly by?  The Amended Complaint, para. 66, A32, cites longstanding criticism of the Legislature, emanating from many quarters.

The Brennan Center at the NYU Law School issued a 2008 report, entitled, "Still Broken: New York Legislative Reform", stating, "'Dysfunctional' is the adjective ascribed to the New York State Legislature by (our) two reports…in 2004 and…2006…It is plain from this and other evidence explored in our latest update that New York's legislative process remains broken." (A92)

Another public interest group, The Center for Public Integrity, evaluates each of the 50 state legislatures in our nation.  Each legislature is given an overall grade, between A through F, upon averaging grades given within 14 different categories.  D+ was the overall grade given the New York Legislature.  In the category of legislative accountability, the grade was D+; public access to information    was    D-;    state    budget    process    was    F.    See, http://www.stateintegrity.org/new_york.

Citizen Union of the City of New York is another respected public interest group.  Their May 6, 2013 report entitled, "Summary of Turnover in the NYS Legislature Due to Ethical or Criminal Issues, 1999 to 2013", states, at

16

unnumbered page 1, that since 1999, 21 state legislators have left office due to criminal or ethical issues. A99. Further, due to pending investigations of legislators Vito Lopez, John Sampson, Malcolm Smith, William Boyland, and Eric Stevenson, five additional seats could be vacated due to corruption.[5]

Government officials, former and current, have also expressed their negative opinions of the New York Legislature, in some of the strongest words possible. See, Lachman and Polner, "Three Men in a Room" (New Press 2006).[6]

---

[5] After this report, Vito Lopez resigned from the Assembly. John Sampson was indicted for embezzlement, and lying to the FBI. A trial awaits him. The criminal trial of Malcolm Smith began, but a mistrial declared after new audiotapes surfaced which had not been translated from Yiddish to English. William Boyland was convicted. Eric Stevenson was convicted.

Citizens Union also did not include the marijuana possession arrest of Assemblyman Steve Katz reported in media in late April, 2013, and the DWI arrest of Assemblyman Robert Rodriguez in early June 2013, A117-119. More recently, Assemblyman Micah Kellner was sanctioned by the Assembly for sexual harassment of staff members, Odato, "Kellner shut down by Silver for alleged harassment", Albany Times Union, June 11, 2014.

[6] Seymour Lachman was a state senator from Brooklyn for 10 years, and a former president of the New York City Board of Education. He bemoans the lack of basic democracy. "Inaction, deliberate paralysis, doesn't come out of thin air. It is a choice that arises, at least in part, from the fact that most legislators can't or won't rock the boat stewarded by the Governor, Assembly Speaker, and Senate Majority Leader, and the private interests that successfully play up to them. The unconnected, unrelated, average citizen or civic-minded entity, voluntary or private, doesn't really stand a chance of influencing the state's course" (*id.* at p.20). He is blunt in his opinions. "So much about Albany breeds cynicism, so much of it stinks – the closed-door meetings, lobbyists insisting on quid pro quo, and vast amounts of questionable spending obscured by secrecy and sleight of hand" (*id.* at p.41). Dr. Lachman also does not skip commenting upon the immoral atmosphere. "I had seen the fraternizing between some legislators and some of the 150 or so college students interning for State Assembly and Senate members and had frowned on it...Albany County district attorney Paul Clyne was so disturbed by the improper fraternizing that he actually advised that parents steer their college-age children clear of Albany – advice the

U.S. Attorney, for the Southern District of New York, Preet Bharara, who has filed several criminal cases against sitting legislators, has also spoken loud and clear. After the filing of the criminal bribery case against Assemblyman Eric Stevenson, Mr. Bharara publicly wrote in April 2013:

> "When it is more likely for a New York state senator to be arrested by the authorities than to be defeated at the polls, they (New Yorkers) should be angry.
>
> And they should ask some pointed questions: How many other pending bills were born of bribery? How many passed bills were born of bribery? How about items in the budget? How much of the work of city and state government is tarnished by tawdry graft?

---

*New York Times* would echo that May in an editorial, saying the students deserved a safer and more wholesome environment." (*id.* at 120)

See, also, "The Days of 'Honest Graft'", City & State, January 29, 2014, an interview of Terry Golway, director of Kean University Center for History, Politics and Policy, Union, NJ, and a former editorial board member, and columnist, NY Times. Mr. Golway states, "We've almost institutionalized bribery in the way that our system works now. Everybody in Albany knows that one way to get on the good side of a lawmaker is to make sure that a lawmaker's law firm is taken care of, because we have this high percentage of lawyers in government. That is as corrupt as anything Tammany ever came up with! These lawmakers who practice law on the side—are you kidding me?! That is corrupt! Until Albany has a full-time Legislature, it will be a cesspool of corruption. It's that simple. Forget public finance. That's another issue entirely. The notion that you can hire the law firm of an assemblyman or a state senator is just on the face of it absurd. And to suggest in any way that Tammany had a monopoly on this sort of chicanery is just willfully stupid. **C&S** City and State)**: Have we codified 'honest graft'?** TG (Terry Golway): I wish I had said that—and I will— though I will attribute it to you. We have codified 'honest graft,' no question about it. And we sort of laugh at George Washington Plunkitt, a Tammany guy who could make a distinction between honest and dishonest graft. Well, we've done it! We've written it into the law. Now it's not 'honest graft'—it's 'lawful graft.'"

What has been perhaps most disheartening is the deafening
silence of the many who, over the course of this investigation
(and others), saw something and said nothing. They learned of
suspicious and potentially criminal activity being conducted in
the halls of the Capitol and elsewhere, and they said nothing.

No one made a call. No one blew the whistle. No one sounded
the alarm. Rather, too many people looked the other way.

What does it say about the culture in our system of government
when officials are aware of criminal conduct around them and
they remain silent?" Bharara, "Deafening Silence From Albany
Pols", <u>New York Post</u>, April 5, 2013 (A116).

Continuing with Mr. Bharara's train of thought, this court can ask: How

many meritorious bills were not passed because people, like the plaintiffs here, did

not bribe anybody?

The combination of chronic Legislature dysfunction, and the stack of

criminal cases, created such a critical mass that Gov. Andrew Cuomo, on July 2,

2013, established a Moreland Commission to Investigate Public Corruption. [7]

---

[7] Some Moreland documents are in the Appendix at A190-201, including, Gov. Cuomo's Press
Release dated July 2, 2013; Gov. Cuomo's executive order dated July 2, 2013; and, the article,
Cuomo, "How We Will Clean Up Albany: Disclosure laws and an anti-corruption panel are
major wins for the public", <u>NY Daily News,</u> July 5, 2013.  On December 2, 2013, Moreland
issued a 98-page Preliminary Report, disclosing some findings, and making recommendations.
http://publiccorruption.moreland.ny.gov/sites/default/files/moreland_report_final.pdf ("The
Commission's preliminary observation is that both the general state of our political system, and
the way business is transacted within, cry out urgently for reform.", p.10). See, Kaplan and
McKinley, "Corruption Panel's Report Offers Look at the Payback Culture in Albany, <u>NY
Times,</u> December 2, 2013. However, in late March 2014, Moreland was disbanded.  See,
McKinley and Kaplan, "Capitol Corruption Panel's Demise Angers Watchdogs", <u>NY Times,</u>

The Amended Complaint also assesses blame on the ultra-orthodox Jewish organization, Agudath Israel, for impeding legislative attempts to make the non-public schools safer (paras. 18, 28-33, 40, 60, 67-69; at A14, 19, 20, 22-23, 29, 33-35). They are extremist, and seek to operate outside the legal system. They offer bloc voting to elected officials, to get what they want, and they do not want child protection laws for their private schools.[8]

---

March 31, 2014; Kaplan, "With Panel Gone, a Move to Monitor New York Lawmakers' Income Is Thwarted", <u>NY Times</u>, April 16, 2014.

[8] The Amended Complaint pleads, para. 18, A14, that the religious school establishment opposed having their schools governed by the 2001 SAVE laws. Executive vice president David Zwiebel, of Agudath Israel, cagily told one newspaper, in 2011, ""We might have said – not necessarily to the legislature – that we appreciate when the state allows us to do things voluntarily rather than forces us to something." (This statement contains two ambiguities. Zwiebel "might" have said it; and he's unsure who it was said to.) Zeveloff, "Leiby Kletzy Killing Calls for Oversight of Yeshivas: Advocates Want Fingerprints and Background Checks of Employees", <u>Jewish Daily Forward,</u> August 5, 2011. Agudath Israel opposition to SAVE, and other proposed child protection laws, is consistent with their attitude towards existing law. Zwiebel (a lawyer) and Agudath Israel openly defy New York's mandated reporting of parent-to-child abuse, Soc. Serv. Law sect. 413. They insist that ultra-orthodox Jewish mandated reporters (*e.g.*, physicians, social workers, school officials) first ask one of their rabbis for permission before contacting law enforcement with a parent-to-child mandated abuse report. Thus, if the rabbi says, no, the ultra-orthodox mandated reporter does not report. Amended Complaint para. 68, A33-35, collects public media quotes where Zwiebel and Agudath Israel make these statements. It should be noted that violation of the mandated reporting parent-to-child abuse law is a Class A misdemeanor, Soc. Serv. Law sect. 420. See, also, this NYS Department of Education web page, at http://www.p12.nysed.gov/nonpub/running/qa-mandated-reporters.html. Seeking to intimidate those who consider reporting child sex abuse to law enforcement, Zwiebel has publicly declared that such reporting is, "'*rechilus, lashon hara, and bittul zman*.' This means malicious gossip, evil tongue, and waste of time, all prohibited by the Torah." Powell, "For Prosecutor in Sexual Abuse Case, Muted Praise From One Corner", <u>NY Times</u>, December 18, 2012. Zwiebel is, of course, dead wrong. It is a Jewish *mitzvah*, a positive commandment, or, good deed, to report a child sex abuser to law enforcement. See, Dratch, "The 411 on 911: Reporting Jewish Abusers

The Amended Complaint also, at para. 42, pleads that New York's non-sectarian, private schools, *e.g.*, the Horace Mann School in the Riverdale section of the Bronx, and the Brooklyn Poly Prep Country Day School, have also been afflicted with child sex abuse. A23.

In a normal democratic state, an engaged Legislature would have, long ago, studied the problem, solicited public comment, conducted hearings, written reports, debated, and voted. They have not, and accordingly, judicial intervention, where so many fundamental constitutional rights are violated, is essential.

## SUMMARY OF ARGUMENT

Defendants, failing to act in accordance with their constitutional duties, are not immune from suit demanding equitable relief. Plaintiffs' constitutional rights under the 14th and 1st Amendments having been violated, they should be granted broad declaratory and injunctive relief. Public and non-public school children should receive identical protection from abuse and neglect.

---

to the Civil Authorities", February 22, 2006 at http://www.jsafe.org/pdfs/mesirah.pdf; and, Dratch, "Let Them Talk: The Mitzvah to Speak *Lashon Hara"*, January 19, 2006 at http://www.jsafe.org/pdfs/Lashon%20Hara%20and%20Abuse.pdf ("...we must not allow the threat of *lashon hara* (malicious gossip) to silence the cry of innocent victims", at p.22) (the author, Rabbi Mark Dratch, is Executive Vice-President of the modern orthodox Rabbinical Council of America.).

# ARGUMENT

## POINT I

### PLAINTIFF'S MOTION FOR LEAVE TO SERVE A SECOND AMENDED COMPLAINT ADDING LEGISLATIVE LEADERS SILVER, SKELOS, AND KLEIN INDIVIDUALLY, PURSUANT TO FRCP  RULE 15, SHOULD BE GRANTED

In defendants' motion to dismiss, they argued that defendants Silver, Skelos, and Klein were immune, because they were named in their official capacities only, and not individually. Plaintiffs responded by cross-moving for leave to file a Second Amended Complaint, A58, naming these three defendants individually.

Additionally, an allegation is added at para. 3 of the proposed Second Amended Complaint that the religious school attended by the plaintiff child does not voluntarily fingerprint and background check their employees.  Defendants had argued in their motion that absent this factual allegation, plaintiff had not suffered harm, and lacked standing to sue.

F.R.C.P. Rule 15 (a) (2) provides that "a court should freely give leave (to amend a complaint) when justice so requires." Where, as here, leave to amend was sought early, and to cure certain inadvertent pleading omissions raised for the first time in a pre-Answer motion to dismiss, the motion should be granted.  See, *Foman v. Davis,* 371 U.S. 178, 182 (1962).

# POINT II

## THE CLAIMS FOR RELIEF ARE NOT BARRED BY EITHER LEGISLATIVE OR SOVEREIGN IMMUNITY

Defendants moved to dismiss on grounds of legislative and sovereign immunity. The District Court granted the motion.

*Marbury v. Madison,* 5 U.S. 137 (1803) is the seminal case standing for the principle that legislative and executive actions are subject to judicial review.[9]

*Spallone v. United States,* 493 U.S. 265, 278-280 (1990), is instructive. In that case, Judge Sand, in the Southern District of New York, ordered declaratory and injunctive relief against City of Yonkers, to correct its history of racial discrimination in public housing. This court affirmed. Subsequently, Yonkers City Council refused to obey the court-ordered relief. Judge Sand imposed financial contempt sanctions upon both the City and the non-compliant City Council members. The Supreme Court held that since there was a "reasonable probability" that contempt sanctions against the City would achieve the desired result of compliance with the court-ordered remedial relief, it was unnecessary to also impose sanctions on the municipal legislators. If, going forward, the Council

---

[9] "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." 5 U.S. at 163. "If one of the heads of departments commits any illegal act, under the color of his office, by which an individual sustains an injury, it cannot be pretended that his office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law." 5 U.S. at 170.

23

refused to comply, the individual contempt sanctions against the individual Council members could be re-visited – *the individual Council members were not immune.*

Federal courts have also that held that immunity is no bar to ordering tax increases to implement constitutional remedies in situations involving racial discrimination, where, as here, a legislature has failed to act. See, *Jenkins v. Missouri,* 493 U.S. 33 (1990); *Milliken v. Bradley,* 433 U.S. 267 (1977); *Griffin v. County School Board,* 377 U.S. 218 (1964). See, generally, Note, "The Legislative Injunction: A Remedy for Unconstitutional Legislative Inaction", 99 <u>Yale Law Journal</u> 231 (Oct. 1989) (collecting cases).[10]

Citing *Marbury*, New York's Court of Appeals in, *Maron v. Silver,* 14 N.Y.3d 230, 263 (2010), held that it was within their judicial review powers to determine whether the New York Legislature satisfied its state constitutional duties

---

[10] The author, Robert A. Schapiro, current Dean of the Emory University Law School, writes, "…the legislative injunction is a legitimate exercise of judicial authority, indeed as legitimate as a court's overturning unconstitutional legislation through judicial review…The legislative injunction responds to a situation, such as a segregated school or an inhumane prison, in which legislative inaction will cause a deprivation of constitutional rights. By mandating a particular action, the court assures that the legislature cannot exercise its 'discretion' not to act and thereby impair individuals' constitutional rights…Nor does the legislative injunction conflict with legislative immunity doctrine…By their very nature, legislative injunctions usurp no legitimate legislative power. Instead they give expression to the evolving constitutional boundaries of legislative discretion, refusing to treat inaction as a privileged exercise of legislative authority. By contrast, a formal view of legislative prerogative which rejects the legislative injunction declares that not the Constitution, but the status quo, is supreme, *id.* at 233-235.

in not granting pay raises to state court judges ("It should be kept in mind, however, that whether the Legislature has met its constitutional obligations in that regard is within the province of this Court (see *Marbury v Madison*...")).[11]  State legislative leaders were also successfully sued in, *Campaign for Fiscal Equity v. State of New York,* 86 N.Y.2d 307 (1995) (whether New York City public schools, under the State Constitution, receive adequate funding).

The District Court below held that the individual legislative defendants – Silver, Skelos and Klein, in their official capacities and individually – could not be sued, because of legislative immunity.  The court cited, *Supreme Court of Virginia v. Consumers Union of U.S., Inc.,* 444 U.S. 719 (1980), but overlooked that this case was distinguished by, *Spallone, supra.* The District Court also did not consider that this court, in *State Emps. Bargaining Agent v. Rowland,* 494 F.3d 71 (2d Cir. 2007), questioned the continued viability of *Consumers Union.*

In *Rowland,* this court held that legislative immunity may apply to bar claims for injunctive relief against state officials in their official capacities.  Here, however, the proposed Second Amended Complaint names the state officials in their individual capacities also. [12]

---

[11] Defendants in *Maron* were, as here, the New York Legislature, and its individual leaders. The Summons is at A91.

[12] *Rowland* involved former unionized state employees, seeking reinstatement to their jobs, a far different fact pattern than what exists here. *Rowland* also held that under *Ex Parte Young,* 209

25

The District Court cited the policy behind legislative immunity – that private civil actions might be a "distraction" and "forces legislators to divert their time, energy, and attention from their legislative tasks to defend the litigation". A209-210. However, the Court did not consider plaintiffs' arguments that the New York Legislature is plagued by dysfunction and corruption, and that plaintiffs and their advocates had been totally ignored.

Legislative immunity is connected to the Speech and Debate Clause of the U.S. Constitution (Art. 1, sect. 6, clause 1), and the NYS Constitution (Article III, sect. 11). These narrowly-drafted clauses protect a legislator from being questioned for their Speech or Debate. It does not immunize them from unconstitutional activity, nor inactivity. Legislative immunity only protects "legitimate legislative activity", see, *Consumers Union, supra at 732*. What has

---

U.S. 123 (1908), 11th Amendment sovereign immunity does not bar plaintiffs' claims for injunctive relief. See, also, *Lynch v. State, 2011 US Dist Lexis 155012 at 188, and n. 274 (*N.D. Ala. 2011) (state officials have no immunity for federal equal protection violations – "a well recognized exception applies in suits by private individuals against state official seeking *declaratory relief or prospective injunctive relief for continuing violations of federal law"*, citing *Ex Parte Young*, 209 U.S. 123, 159-160 (1908), and other cases; *Madden v. Kentucky,* 309 U.S. 83, 92 (1940) ("In the states, there reposes the sovereignty to manage their own affairs except only as the requirements of the Constitution otherwise provides."); *Cent. Rabbinical Cong. v. NYC Dept. of Health,* 2013 U.S. Dist 4293 (S.D.N.Y. 2013) (ultra-orthodox Jewish groups unsuccessfully sought to invalidate a Board of Health rule that regulates *metzitzah b'peh*, a post-circumcision wound ritual); *Commack Self Service Kosher Meats* v. *Weiss,* 294 F.3d 415 (2d Cir. 2002) (kosher butcher successfully sought a declaration against state officials that it is unconstitutional for a state statute to define "kosher" as food "prepared in accordance with orthodox Hebrew religious requirements").

occurred to plaintiffs, and so many others, is not legitimate particularly where, as here, there has been neither speech, nor debate.[13]

Further, the District Court held that the Assembly and Senate are protected from suit by sovereign immunity,[14] citing, *Gollomp v. Spitzer,* 568 F.3d 355, 366 (2d Cir. 2009), where the NYS Unified Court System – not the State Legislature - was held to be an arm of the state, and immunized from suit under the sovereign immunity doctrine. The plaintiff in *Gollomp* was also held to be a frivolous litigant, the case was dismissed, and he was sanctioned. He originally was involved in a property damage lawsuit in state court, and when he lost, he sued various state officials, including judicial officials, in federal court. The federal case was dismissed. *Gollomp* is clearly distinguishable. Legislators are representatives of the people, and not arms of the sovereign state. Their unconstitutional conduct should be subject to challenge in court.

_____

[13] See, also, NYS Constitution Article XIII, section 1, requiring that legislative members shall swear to support the Constitution of the United States and New York. Further, NY Legislative Law sect. 1-a states, "The legislature hereby declares that the operation of responsible democratic government requires that the fullest opportunity be afforded to the people to petition their government for the redress of grievances..."

[14] Defendants themselves did not raise this argument.

# POINT III

## PLAINTIFFS POSSESS ARTICLE III STANDING

Defendants also moved to dismiss on the ground that plaintiffs lack Article III standing because as to the sought-for mandatory employee fingerprint law, plaintiffs did not allege that the child's yeshiva did not fingerprint. The proposed Second Amended Complaint, para. 3, A58, supported by the declaration of plaintiff, A153, cured this alleged pleading defect.

The cases cited in defendants' memorandum of law filed April 3, 2013, at docket no. 20 in the court below, pertain to an IRS tax ruling involving a hospital, *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 28 (1976); a father's failure to pay child support, *Linda R.S. v. Richard D.,* 410 U.S. 614(1973), and an automobile tire safety rule, *Public Citizen, Inc. v. Nat'l. Highway Traffic Safety Admin.,* 489 F.3d 1279 (D.C. Cir. 2007). None of these cases involve the deprivation of fundamental, constitutional rights, for a protected class of children, for whom the law requires a high duty of care, as will be seen, *infra.* A state created harm is present here, and plaintiffs, and members of their class, are being treated like second class citizens. They well possess standing.

28

## POINT IV

## PLAINTIFFS HAVE BEEN DENIED
## EQUAL PROTECTION OF THE LAW

Plaintiffs' rights under the 14th Amendment, guaranteeing equal protection of the law, have been infringed.[15]

The strict scrutiny test should be applied to plaintiffs' equal protection claim, given the deprivation of their fundamental constitutional rights to life, liberty, and religion. See, *Church of Lukumi v. City of Hialeah,* 508 U.S. 520, (1993); *Loving v. Va.,* 388 U.S. 1 (1967); *Brown v. Bd. of Ed.,* 347 U.S. 483, 496 (1954) ("separate educational facilities are inherently unequal"); *Skinner v. Oklahoma,* 316 U.S. 535 (1942); *U.S. v. Carolene Prods. Co.*, 304 U.S. 144, 152 at n.4 (1938) (Stone, J.).[16]

Relevant also is animus against religion, particularly against modern orthodox Jews and other moderate co-religionists, which should also trigger the strict scrutiny test. The Legislature as a whole, by capitulating to ultra-orthodox Jews and other extremists, has revealed, at best, its apathy towards moderate

---

[15] Scholars consider the 14th Amendment, enacted in 1868 shortly after the Civil War, so important, that it is sometimes referred to as the "Second Constitution". See, Epps, "Democracy Reborn: The Fourteenth Amendment and the Fight for Equal Rights in Post-Civil War America" (Henry Holt 2006).

[16] This is the most cited footnote in Supreme Court history, and requires strict scrutiny for religious minorities, aggrieved by violation of their constitutional rights, for whom the political process offers little redress.

religious families who want their schools regulated for safety; at worst, there may be some legislators who are simply hostile to religion in general. *Village of Arlington Hts. v. Metro Housing Dev. Corp.,* 429 U.S. 252, 265-266 (1977*); Goosby v. Town Bd.,* 180 F.3d 476 (2d Cir. 1999); *Carolene Prods., supra.*[17]

Children, in particular, are owed a high duty of care. The State is *parens patriae* for the protection of children, *Prince v. Mass.*, 321 U.S. 158, 165-168 (1944) ("The state's authority over children's activities is broader than over like actions of adults. This is peculiarly true of public activities…A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." 321 U.S. at 168). See, also, *Bethel School Dist. v. Fraser,* 478 U.S. 675, 684 (1986) ("These cases recognize the obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children -- especially in a captive audience – from exposure to sexually explicit, indecent, or lewd speech"); *Veronica Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995) ("When parents place minor children in private schools for their education, the teachers and administrators of those schools stand in loco parentis over the children entrusted them.").

---

[17] See, Davis, "America's True History of Religious Tolerance: The idea that the United States has always been a bastion of religious freedom is reassuring – and utterly at odds with the historical record", <u>Smithsonian Magazine,</u> October 2010.

In tort cases, the New York Court of Appeals has written similarly, stating that a school owes a heightened or special duty of care to its students, by virtue of the transfer of physical custody of the children from the parents to the school. *Pratt v. Robinson*, 39 N.Y.2d 554, 560 (1976); *Hoose v. Drumm*, 281 N.Y. 54, 57-58 (1939).  Judge Cardozo in, *Finlay v. Finlay,* 240 N.Y. 429, 434 (1925), states that the Government is "*parens patriae*" for the protection of infants. See, also, *Binghamton City Sch. Dist. v. Peacock*, 33 A.D.3d 1074, 1076 (3rd Dept. 2006), *app. dism* 8 N.Y.3d 840 (2007) (New York possesses an: "...explicit and compelling public policy to protect children from the harmful conduct of adults (see e.g. Social Services Law section 384-b; Family Ct Act, Article 10), particularly in an educational setting (see e.g. Education Law Article 23-B; Executive Law section 296 [4]).  When an educator's conduct involves inappropriate contact with students who are minors, this policy gives the highest priority to protecting their welfare (see e.g. Matter of Shurgin v Ambach, 56 NY2d 700, 703 [1982] ....))."

See, also, N.Y. Educ. Law Art. 12, "Health and Safety Grants for Nonpublic School Children", at Sect. 549(1) therein, providing as follows: "The legislature hereby finds and declares that: . . . The state has a primary responsibility to ensure the health, welfare and safety of children attending *both public and nonpublic*

31

*schools*." (emphasis added).[18]

The executive branch of the federal government has also recognized the high duty of care owed to both public and non-public school children. In 2004, the U.S. Education Dept. issued, to much national publicity, a 150-page report, "Educator Sexual Misconduct: A Synthesis of Existing Literature" (Amended Complaint para. 54, A28; www2.ed.gov/rschstat/research/pubs/misconductreview/report.pdf). The report, at section 12.0, pp. 47-50 urges, for all schools, employee background checks, mandated reporting, and other prophylactic measures to prevent abuse. The report also informs that approximately 9.6 per cent of all k-12 children are subject to educator sexual misconduct (p.20). (Amended Complaint para. 54).

---

[18] See, also, Educ. Law sect. 804, providing that *all* schools must provide instruction to discourage tobacco and illegal substance abuse; Educ. Law sect. 808, providing that *all* schools shall instruct pupils in fire and arson prevention; Educ. Law sect. 807, requiring fire drills in *all* schools; Educ. Law 807-a, requiring inspection of *all* schools for fire hazards; Educ. Law sect. 409-a, requiring that *all* pupils in shop or lab classes involving dangerous activities wear eye safety devices; Educ. Law sect. 912, requiring that public school districts provide health and welfare services to nonpublic school children; and Public Health Law sect. 2164, requiring immunizations of *all* school children. The existence of these laws (not to mention other laws and regulations of general applicability, e.g., building codes) overwhelmingly demonstrates the irrationality of the Legislature in exempting non-public school children from the ten public school child protection laws recited in the Amended Complaint at para. 63, A30. It should be noted, also, that the Legislature completely ignored the explicit support for a then-written mandatory nonpublic school employee fingerprint bill given, in 2012, by seven nonprofit groups, i.e., The New York Society for the Protection of Cruelty to Children; American Professional Society on the Abuse of Children; Prevent Children Abuse New York; Ohel Children's Home and Family Services Inc.; Rabbinical Council of America (1,000 modern orthodox rabbis); Children's Healthcare Is a Legal Duty Inc; Jewish Board of Advocates for Children. A132-139.

Moreover, at least 12 states require non-public school employee fingerprinting and background checks. See, Alabama: sect. 16-22A-6; California: Educ. Code sects. 33190(g), 33191(a); Florida: sect. 1002.421 (2)(i); Illinois: ILCS 512-3.250; Louisiana R.S. 15:587.1; Maryland: Family Law Code Ann. sect. 5-561; Massachusetts: 71 M.G.L. 38R; Michigan: M.C.L.S. sect.380.1230; Minnesota: Stat. sect. 123B.03; Ohio: R.C. 3319.391; Pennsylvania: 24 P.S. sect. 1-111; Rhode Island: Gen. Laws sect. 16-2-18.1.  These states represent about 40 per cent of the U.S. population.  That New York, the third most populated state with 19 million people, possessing a significant non-public school population – 400,000 children, about 13 per cent of the total – does not have mandated employee fingerprinting and other basic child protection laws, is totally irrational.

To be noted is that in addition to mandatory public school employee fingerprinting (Educ. Law sects. 305(30), 2590-h (20)), all New York State child day care center workers must be fingerprinted, Soc. Serv. Law sect. 390-b. Licensed school bus drivers must be fingerprinted, Vehicle & Traffic Law sect. 509-d. Nursing home workers must be fingerprinted, Public Health Law sects. 2899, 2899-a.  New York City child day care centers required to have a permit issued by the N.Y.C. Health Department must fingerprint and background check their current and prospective employees, Title 24, Rules of the City of New York (RCNY), sect. 47.15. All New York City *religious* child day care centers are

33

required to fingerprint their current and prospective employees, pursuant to the recently enacted RCNY sect. 43.13.   The irrationality of New York State not requiring the fingerprinting of k-12 non-public school employees is manifest.

A complete list of all occupations in New York State, and throughout our nation, that are subject to mandatory fingerprinting, is beyond the scope of this brief (see, *e.g.*, "Transportation Security Adm. Completes Background Checks on 1 Million Truckers" (tsa.gov/press/releases/2008/12/29/tsa-completes-background-checks-over-1-million-truckers). Suffice it to state that as long ago as 1969, Judge Weinfeld wrote the following in, *Thom v. New York Stock Exchange*, 306 F. Supp. 1002, 1007-1008 (S.D.N.Y. 1969), where plaintiff's constitutional challenge to a mandated employee fingerprint rule was rejected:

> "Plaintiffs' contention that fingerprinting is an affront to their dignity and an invasion of their privacy is without substance. The day is long past when fingerprinting carried with it a stigma or any implication of criminality. Federal and state courts alike, in upholding fingerprinting requirements, have rejected any such view. Our Court of Appeals, almost forty years ago, in upholding the right of federal agents to take fingerprints after an arrest upon probable cause, even in the absence of statutory authority, observed, "Fingerprinting is used in numerous branches of business and of civil service, and is not in itself a badge of crime." (United States v. Kelly, 55 F.2d 67, 70 (2d Cir. 1932)).  To the same effect is a state court's contemporaneous opinion upholding a regulation requiring fingerprinting for the issuance of a license to deal in secondhand articles. Fingerprinting in noncriminal contexts today is even more widespread. It is required of all employees of United States government agencies and departments.  As far back as 1910, the New York City Municipal Service Commission adopted fingerprinting as a

34

means of identification, so that today there are thousands upon thousands of fingerprints of city employees on file with the Commission. (footnotes omitted)."

See, generally, Buschmann, "Mandatory Fingerprinting of Public School Teachers: Facilitating Background Checks or Infringing on Individuals' Constitutional Rights?", 11 William & Mary Bill of Rights Journal 1273 (2003); Cole, "Suspect Identities: History of Fingerprinting and Criminal Identification" (Harvard Univ. Pr. 2002) (Sir Frances Galton of England is generally credited as being the scientific discoverer of utilizing fingerprints as an identifier, in 1888).

The Equal Protection Clause is essentially a directive that "all persons similarly situated should be treated alike", *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985); *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n,* 483 F.3d 1025 (10th Cir. 2007) (state school activities association violates Equal Protection Clause by rule which grants automatic admission to public schools, but requires a majority vote for nonpublic schools; summary judgment granted for plaintiff); *Smith v. Gilpin Co.,* 949 F. Supp. 1498 (D. Col. 1996) (state violates Equal Protection Clause if it selectively denies police protection to disfavored minorities, citing, *DeShaney v. Winnebago County Dept. of Social Services* 489 U.S. 189 (1989)); *Mody v. City of Hoboken,* 758 F. Supp. 1027 (D. N.J. 1991) (same); *Robinson v. Commonwealth,* 584 N.E.2d 636 (1992)

35

(same); *Estate of Rosenbaum v. City of NY,* 975 F. Supp. 206 (E.D.N.Y. 1997) (same; plaintiffs alleged that during riots in Brooklyn, orthodox Jews were denied police protection).  See, also, *Zobrest v. Catalina Foothills Sch. Dist.,* 409 U.S. 1, 8 (1953) ("if the Establishment Clause did bar religious groups from receiving general government benefits, then 'a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair'…a contrary rule would lead to such absurd results"); Dwyer, "The Children We Abandon: Religious Exemptions to Child Welfare and Education Laws as Denials of Equal Protection to Children of Religious Objectors", 74 N. Car. L. Rev. 1322 (1996); Dwyer, "Religious Schools v. Children's Rights" (Cornell Univ. Pr. 1998).[19]

In *Zobrest*, *supra,* the Supreme Court wrote that it would be "absurd" to deny police and fire protection and other general government benefits to religious groups.  Yet, that is precisely what has occurred here.  New York's 400,000 non-public school children, and their 800,000 parents, have been exempted from ten child protection laws.  The non-public schools, as a result, have been made quite hazardous.  Just as one example, a registered sex offender declined employment in the public schools can, without detection, apply for and obtain employment in a religious school.  This patent infringement on plaintiffs' equal protection rights needs to be rectified.

---

[19] The author, James G. Dwyer, is of counsel to plaintiff.

## POINT V

## DEFENDANTS VIOLATE THE DUE PROCESS/ LIBERTY CLAUSE OF THE 14TH AMENDMENT

In *Pierce v. Society of Sisters,* 268 U.S. 510 (1925), it was held that under the substantive Due Process/Liberty Clause of the 14th Amendment, families possess a liberty interest for enrolling their children in a religious or private school. In *Pierce,* Oregon's law, requiring public school attendance only, was held unconstitutional. This key passage, from the unanimous court, is instructive:

> "...we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." (*id.* at 534-535)[20]

---

[20] For the historic background of *Pierce,* see, Abrams, "Cross Purposes: Pierce v. Society of Sisters and the Struggle over Compulsory Public Education" (Univ. of Mich. Pr. 2009). The white supremacist group, the Ku Klux Klan, had a second revival in the early 20th century. After murdering and terrorizing tens of thousands of African-American citizens shortly after the Civil War, much of their violence was contained after the passage of 42 U.S.C. 1983, also known as the Ku Klux Klan Act of 1871, which enabled President Grant to utilize the U.S. Army to stop the Klan. When, in the early 20th century, millions of eastern and southern Europeans, and Irish,

37

Defendants, in the court below, arguing against plaintiffs' second claim for relief brought under the Due Process/Liberty Clause, asserted in their brief that "plaintiffs were afforded sufficient process – i.e., the ordinary legislative process – before they were deprived of that claimed liberty interest." (memorandum dated April 3, 2013, at p. 17, docket no. 20). This is specious reasoning.

First, there has never been any "ordinary legislative process". All of the evidence spells this out.

Further, even assuming such a "process", there are some deprivations of liberty that the state and its officials may not make regardless of the supposed process it offers its citizens. In *Lawrence v. Texas,* 539 U.S. 558 (2003), for example, the Court held that intimate, same sex conduct was protected by the 14th Amendment Liberty/Due Process clause. The Court did not hold that same sex attracted persons were afforded their Liberty rights by having the opportunity to participate in the legislative process.

---

emigrated to America, mostly Catholics and Jews, the Klan rose again, joining with a nativist movement. The Klan elected legislators and governors throughout the country, including Oregon's Governor Pierce. The Klan also supported a ballot initiative in Oregon requiring all children to attend public schools only, to the exclusion of religious and private schools. The initiative passed, with a vote of about 115,000 to 105,000. The Klan campaign for the law fed on anti-Catholic sentiment. Plaintiffs in *Pierce* were an Oregon Catholic school and a private military school.

Plaintiffs have been constructively denied their constitutional Liberty rights, because defendants have affirmatively made the religious schools unsafe. Amended Complaint para. 63, A30, lists ten laws from which the nonpublic schools are exempted - as a result, the religious schools are unsafe.   Some examples of unsafe conditions follow:

* Because registered sex offenders, and other persons with serious criminal histories, may apply for and receive employment in the nonpublic schools without being fingerprinted, while many other New York employment sectors do exactly that, including the public schools, the nonpublic schools therefore become a magnet for these deviant individuals.

* Nonpublic school teachers who abuse a child are not required to be reported to law enforcement.   In public schools, they are.   Educ. Law sects. 1125-1133.   Thus, abusive nonpublic school teachers circulate among the non-public schools, because they don't get arrested and convicted.

* Educ. Law sect. 3004 provides that all public school administrators and teachers are required to complete coursework in identifying and reporting child abuse or maltreatment, and in reporting abuse.   This law, again, exempts non-public schools.   Thus, the child who is being physically or sexually abused at home, and exhibits certain symptoms, is much more

likely to come to the attention of a public school teacher, than a non-public school teacher.  The public school teacher, with some gentle inquiry, can refer the child to social services, and if necessary, criminal law enforcement authorities can become involved.  That child will be protected, while his or her non-public school child counterpart will not be.

\*      Similarly, Educ. Law sect. 3209-a requires all public school districts to establish written abuse prevention policies.  Non-public schools are exempt.  The public school children are better protected.

\*      Educ. Law Article 55 requires public schools only to establish and implement school safety plans.  This was a key part of SAVE, enacted in 2001, and it is particularly relevant today, after 20 children and 6 adults were murdered at the Sandy Hook elementary school in Newtown, CT on December 14, 2012.  In a day and age of school shootings, and terrorism, it is unconscionable that non-public schools are exempt from this law.

It is apparent that plaintiff's liberty right to attend a reasonably *safe* religious school has been infringed.  Under Educ. Law sect. 3204(1), parents are required to enroll their children in either a public or non-public school.[21] *Pierce* guarantees the

---

[21] The non-public school teachers must be "competent", and non-public school instruction must be "substantially equivalent to that given in the public schools".  Educ. Law sect. 3204(2).  See, generally, "School Law" (NYSBA, 34th ed. 2012)

40

constitutional right to enroll the child in a religious school.  Accordingly, plaintiffs are entitled to the broad equitable relief demanded in the Amended Complaint.

## POINT VI

### DEFENDANTS INFRINGE UPON PLAINTIFFS' FREE EXERCISE OF RELIGION RIGHTS

By exempting the religious schools from ten child protection laws, defendants have also infringed upon plaintiffs' free exercise of religion rights, found in the 1st Amendment.

Children deserve to study and practice their religion in a building that is just as safe as public schools.  However, because of defendants' legislative scheme, whereby nonpublic schools are exempted, the yeshivas and Catholic schools have been made hazardous.  That, in and of itself, is an infringement of the free exercise of religion clause. Defendants have made it hazardous for children to practice their Jewish, Catholic, and other religions.

Defendants argued in the court below that, "Project SAVE is a valid and neutral law of general applicability.  Its applicability does not depend on whether a school is affiliated with any particular religion; rather, its applicability depends only on whether the school is public or nonpublic.  Thus, Project SAVE does not violate the Free Exercise Clause." (memorandum dated April 3, 2013 at p.15, docket no. 20).

41

A State Department of Education Freedom of Information Law response dated September 13, 2012, is informative, A120.    Table 2 therein provides nonpublic school enrollment by affiliation for 2010-2011.    There were 416,043 children in the nonpublic schools.    There were 346,519 children in religious schools.    There were 69,524 children in the nondenominational schools.  *Thus, approximately 83 percent of all non-public school children in New York State attend religious schools*.

The exemption from Project SAVE, and the other public school child protection laws, overwhelmingly impacts the religious school children.    The religious schools are made more hazardous because of this exemption.    Most of these religious schools are attended by children from middle income, working income, and poor families who struggle mightily to pay tuition so that their children can receive both a secular and religious education.    While the rich nondenominational schools may have the financial means to provide good security, most religious schools don't.

The Amended Complaint also pleads, at para. 23, A17, that defendants have adversely affected the religiosity and spirituality of plaintiffs, and other religious school children and their parents.  It is pleaded that defendants...

> "...did not properly consider that the Jewish, Christian, and other religions cannot be freely exercised, under the First Amendment, in a school where children are exposed to grave danger.    These officials did not consider

42

the spiritual, religious, psychic, emotional, and physical harm to young children that can occur when they are physically or sexually abused. These officials also did not consider the ripple effect of child abuse occurring in nonpublic schools – not only are the victims themselves harmed, but other children in the yeshivas and religious schools develop cynical and negative attitudes about their respective faiths.  Jewish, Christian, and other religious school children no longer actively practice their religions, or have curtailed their practice of religion, causing much bitterness and anger to them, and also to their parents, who sacrificed greatly to pay their religious school tuition." (A17-18)

Amended Complaint para. 90, A39, incorporates the above, and adds, "The father (also) has a constitutional right for his daughter to attend a safe religious school that receives the same legal protections of public schools.  The infringement of this constitutional right adversely affects the father's practice of his religion, his psyche, and his spirituality." (A39)  The father has also filed a declaration herewith complaining about being treated in an "inferior" fashion. (A153)

It is apparent that plaintiffs are being denied their free exercise rights, and should be granted broad equitable relief.

## POINT VII

### DEFENDANTS HAVE INFRINGED UPON PLAINTIFFS' ESTABLISHMENT CLAUSE RIGHTS

Amended Complaint para. 24 (A18) pleads as follows:

"Further, New York State and nonpublic school officials did not properly consider that in exempting the nonpublic schools from the Project SAVE (and other) child

43

protection laws, they were manifesting an intent to show more favorable treatment to religious institutions, thereby violating First Amendment Establishment Clause principles, as stated in, *Texas Monthly, Inc. v. Bullock,* 489 U.S.1, 8 (1989): "In proscribing all laws 'respecting an establishment of religion,' the Constitution prohibits, at the very least, legislation that constitutes an endorsement of one or another set of religious beliefs or of religion generally.   It is part of our settled jurisprudence that 'the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization' (citation omitted)"   In exempting the religious schools from the Project SAVE (and other) child protection laws, the New York State government, intentionally or not, was putting an imprimatur on the type of ultra-orthodox Judaism practiced by the constituency of Agudath Israel, and upon other religious groups who sought not to be regulated by the SAVE laws."

The Amended Complaint assesses much blame upon the ultra-orthodox Jewish organization, Agudath Israel, for impeding legislative attempts to make the non-public schools safer (Amended Complaint paras. 18, 28-33, 40, 60, 67-69, at A14, 19-21, 22, 29, 33-35).

The Amended Complaint further, at para. 71, at A35-36, compares this situation to England, circa 1076 through mid 1500s, when there were parallel court systems - royal courts, where the masses were adjudicated, and also ecclesiastic courts.   Clergy accused of crime were leniently adjudicated in the ecclesiastic courts, under the "benefit of the clergy"  privilege - *privilegium clericale.*   This

privilege is supposed to be extinct in American law today, where no person is above the law. However, under the radar, because New York has different laws for public and religious schools, misbehaving clergy can evade criminal law authorities, and be leniently adjudicated in religious tribunals. *Privilegium clericale* is, in a sense, still alive. See, Hamilton, "God vs. The Gavel: Religion and the Rule of Law" (Cambridge Univ. Pr. 2005) at pp. 238-272.

The effect of exempting the non-public schools from the ten child protection laws is to advance the ultra-orthodox Jewish and other religions which want to operate their schools in totally separatist fashion, without being subject to government health and safety laws. This type of religious extremism has received an impermissible imprimatur from the government, violating Establishment Clause principles, as so clearly stated in, *Texas Monthly v. Bullock, supra.* Plaintiffs have been harmed as a result, and should be granted broad equitable relief.

## CONCLUSION

Defendants' Rule 12(b)(6) pre-Answer motion should be denied.

Pursuant to Rule 15(a) (2), the proposed Second Amended Complaint should be deemed filed.

Pursuant to Rules 12(d) and 56, plaintiffs should be granted summary judgment on all four claims for relief. Declaratory and injunctive relief should be granted, in plaintiffs' favor. It should be declared that it is unconstitutional for defendants to have exempted the non-public schools from the ten child protection laws recited in both the Amended Complaint and proposed Second Amended Complaint at para. 63 (A30, 78). Defendants should be enjoined from not ending this exemption. This court also should grant such other and further relief as may be just and proper.

Dated: July 1, 2014

Respectfully submitted,

JAMES G. DWYER                          ELLIOT B. PASIK
Arthur B. Hansen                        Of Counsel
Professor of Law                        Law Office of Gerald P. Gross
William & Mary School of Law            Attorneys for plaintiff-appellants
613 S. Henry Street                     366 Pearsall Avenue, Suite 5
Williamsburg, VA 23185                  Cedarhurst, NY 11516
Telephone: (757) 221-2685               Telephone: (516) 371-2800
jgdye@wm.edu                            efpasik@aol.com

46

**Federal Rules of Appellate Procedure Form 6.  Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed.R. App. P.32(a)(7)(B) because:

☑   this brief contains  11,530                words, excluding the
parts of the brief exempted by Fed. R.App. P. 32(a)(7)(B)(iii), *or*

☐   this brief uses a monospaced typeface and contains   [state the number of]
lines of text , excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of  Fed. R. App. P. 32(a)(5) and the
type style requirements of Fed. R. App. P. 32(a)(6) because:

☑   this brief has been prepared in a proportionally spaced typeface
using [ Microsoft Word                       ] in
[ 14 font Times New Roman            ], *or*

☐   this brief has been prepared in a monospaced typeface using
[ state name and version of word processing program  ] with
[ state number of characters per inch and name of type style ].

(s)    Elliot B. Pasik

Attorney for   Plaintiff-Appellant

Dated:   June 30, 2014